U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 18, 2009**                                    **United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 7 |
| BRENDON T. MEURER, | § | |
| | § | CASE NO. 09-41446 (DML) |
| DEBTOR. | § | |

### Memorandum Opinion

Before the court is the *United States Trustee's Motion to Dismiss Under 707(b)(1)* (the "Motion") filed by the United States Trustee (the "UST") on July 17, 2009. Brendon T. Meurer ("Debtor") objected to the Motion by his *Objection to United States Trustee's Motion to Dismiss Under 707(b)(1)* (the "Objection") which was filed on August 6, 2009. The court considered the Motion and the Objection at a hearing on October 8, 2009 (the "Hearing"). At the Hearing the court heard argument from counsel for Debtor and the UST as well as receiving testimony from Debtor and Charles Vorkoper ("Vorkoper"), an

1 of 15

expert in the treatment of compulsive gamblers. The court also admitted numerous

exhibits offered by both Debtor and the UST, which will be identified below as needed.

Certain of the facts relevant to the issues before the court were stipulated to by Debtor

and the UST through a *Stipulation of Facts* (the "Stipulation") which was filed on

October 8, 2009.

At the conclusion of the Hearing, the court asked the parties to brief two issues.[1]

Both Debtor and the UST submitted briefs on October 19, 2009.

The court exercises core jurisdiction over this matter pursuant to 28 U.S.C. §§

1334(a) and 157(b)(2)(A). This memorandum opinion embodies the court's findings of

fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I. Background

### A. Relevant Financial History

Debtor and his wife purchased their current home in May of 2006, for $474,900.

The purchase was fully financed through two mortgages. At the time of the home

purchase Debtor and his wife were earning a gross income of $10,000 per month. Debtor

was also receiving an annuity (the "Annuity"), which was compensation for a childhood

eye injury, in the amount of $2,916 per month.

In May, 2008, Debtor and his wife refinanced their home. At the time of Debtor's

chapter 7 filing, the mortgage payments on the home were $2,890 per month, not

including insurance or taxes. According to the Stipulation, Debtor and his wife pay

---

[1] The court asked the parties to brief whether, when a debtor's "disease" leading to a need for bankruptcy involved illegal conduct, illegality should be considered in a dismissal analysis under 11 U.S.C § 707(b)(3)(A) or (B). The court also asked the parties to brief why, if a debtor is not presumed to abuse chapter 7 under 11 U.S.C. § 707(b)(2)(A) and so his or her chapter 13 case would return nothing to creditors, should the chapter 7 case be dismissed.

$194.33 per month for homeowners insurance and set aside approximately $988.32 per month for *ad valorem* taxes. The total housing payment is thus $4,072.73 per month.

Debtor leases two cars. Debtor began leasing the first, a 2005 Lexus (the "Lexus"), in September of 2008. Debtor has reaffirmed the lease (*see* section 524(c) of the Bankruptcy Code[2] (the "Code")) for the Lexus and pays $697.21 per month for it. Debtor began leasing the second car, a 2005 Acura (the "Acura"), in December of 2008. Debtor has also reaffirmed the lease for the Acura and makes monthly payments of $416.23 for the Acura. At the Hearing Debtor testified that both the Lexus and the Acura are less expensive than the cars they replaced and that he saves approximately $475 per month by leasing them, as opposed to making payments on his previous cars.

As of July 31, 2009, Debtor's gross monthly salary was $10,511.[3] In the Stipulation, the parties agreed that the net monthly income of Debtor and his wife was at the time of the Hearing approximately $7,796.50.[4]

### B. Gambling

In 2008, Debtor sold his right to future payments from the Annuity for $150,000. Between January 1, 2008, and May 5, 2008, Debtor paid $149,585 in credit card debt, primarily using the proceeds from the sale of the Annuity. At the Hearing Debtor testified that a majority of the $149,585 credit card debt was incurred through gambling losses. Debtor incurred an additional net $110,000 of gambling losses in 2008 and lost a net of approximately $5,000 through gambling in 2009. According to the Stipulation, the last

---

[2]  11U.S.C. §§ 101 *et. seq.*

[3]  This amount is composed of a base salary of $6,129, bonus of $3,657, and other income of $725.

[4]  This amount reflects a decrease of income from that reflected on Debtor's schedule I. The decrease is the net result of a 5% reduction in Debtor's base salary, elimination of his 2010 bonus, and an increase in his wife's income of $453 per month.

time Debtor gambled was in May, 2009. Debtor's gambling was conducted through a bookie and was apparently illegal under Texas law.[5]

At the Hearing, Vorkoper testified that Debtor's gambling is due to an addictive disorder. Vorkoper further testified that he began treating Debtor for his gambling addiction on July 31, 2009.

### C. Bankruptcy Petition

Debtor filed for relief under chapter 7 of the Code on March 9, 2009. Debtor's wife did not file for chapter 7 relief, though at the Hearing Debtor testified that she has approximately $60,000 of unsecured credit card debt with minimum monthly payments of approximately $1,100 to $1,200. Debtor paid approximately $1,800 to his bookie post-petition.[6]

### II. Discussion

By the Motion, the UST asks the court to dismiss Debtor's case pursuant to Code § 707(b)(1). Section 707(b)(1) provides, in relevant part:

> After notice and a hearing, the court… may dismiss a case filed by an individual debtor… if it finds that the granting of relief would be an abuse of the provisions of this chapter.

Section 707(b)(1) was added to the Code by Congress in 1984. There are some important differences between the original version of section 707(b)(1), and the version that exists today. The original version of section 707(b)(1) provided that a chapter 7 case could be dismissed if the court found "that the granting of relief would be a substantial abuse of the provisions of" chapter 7.

---

[5] *See* Tex. Penal Code Ann. § 47.02 (2009)

[6] This debt was not reflected on Debtor's schedules.

In 2005 Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). BAPCPA made numerous changes to the Code, including amending section 707(b)(1) to provide for dismissal of a chapter 7 case for abuse, rather than for "substantial abuse" as was required under the 1984 version of section 707(b)(1). Further, BAPCPA removed a statutory presumption in favor of granting relief under chapter 7 from Code § 707(b)(1).[7]

In addition to removing the presumption in favor of relief and appearing to lower the standard for dismissal under section 707(b)(1), BAPCPA also added Code § 707(b)(2) and (3). Code § 707(b)(2)(A)(i), commonly referred to as the "means test," creates a presumption of abuse in certain circumstances. The means test is a mathematical formula by which a debtor's disposable income is calculated. If a debtor filing chapter 7 has sufficient disposable income to provide a return to Debtor's creditors via a chapter 13 case, abuse is presumed. The presumption of abuse does not arise in the instant case.

Section 707(b)(3) specifies that a court must consider two issues in disposing of a dismissal motion made under section 707(b)(1) when the presumption of abuse specified in Code § 707(b)(2)(A)(i) has not arisen or has been rebutted. Because the presumption of abuse specified in section 707(b)(2)(A)(i) has not arisen in the case at bar, the court must consider the Motion under Code § 707(b)(3).

Section 707(b)(3)(A) requires the court to examine whether a debtor filed his bankruptcy petition in bad faith. *See* Code § 707(b)(3)(A). Section 707(b)(3)(B) directs the court to consider whether the totality of a debtor's financial circumstances

---

[7] The original 1984 version of Code § 707(b)(1) included the sentence: "There shall be a presumption in favor of granting the relief requested by the debtor." This sentence was struck in its entirety by BAPCPA.

demonstrates that his bankruptcy is an abuse of the relief offered by chapter 7 of the

Code. *See* Code § 707(b)(3)(B). Because the court is granting the Motion on the basis of

the totality of Debtor's financial circumstances under Code § 707(b)(3)(B), it is

unnecessary for the court to address whether Debtor filed for bankruptcy in bad faith.[8]

### A. Totality of the Circumstances.

Section 707(b)(3)(B) states:

(3) In considering under paragraph (1) whether the granting of relief
would be an abuse of the provisions of this chapter in a case in which the
presumption in subparagraph(A)(i) of such paragraph does not arise or is
rebutted the court shall consider…
(B) the totality of the circumstances (including whether the debtor seeks to
reject a personal services contract and the financial need for such rejection
as sought by the debtor) of the debtor's financial situation demonstrates
abuse.

In order for the court to dismiss Debtor's case under Code § 707(b)(3) the UST

must prove abuse by a preponderance of the evidence. *In re Pandl,* 407 B.R. 299, 301

(Bankr. S.D. Ohio 2009); *see also In re Norwood-Hill,* 403 B.R. 905, 912 (Bankr. M.D.

Fla. 2009).

This court has previously examined what constitutes abuse under Code §

707(b)(3)(B). Although it opined that the presence of abuse would ordinarily be facially

apparent, the court cited three categories of factors for testing its perception that a

debtor's filing was abusive of chapter 7. *See In re Daugherty*, 2009 Bankr. Lexis 2691

---

[8]     The court recognizes that "bad faith" has been tested based on factors that might be found to exist
in the case at bar. The court, however, does not consider Debtor's filing, like that of a serial filer
abusing the system to hinder and delay creditors, to present clear evidence of bad faith. *Cf.* Code
§§ 362(c)(3) and (4), also added by BAPCPA. While a gambling addiction, as discussed below,
may not warrant the same sympathy as a disease such as cancer, neither does its central role in
Debtor's financial difficulties and bankruptcy filing evidence bad faith.

(Bankr. N.D. Tex.. Sept. 8, 2009). *Daugherty* points to the following categories of

factors[9]:

> 1. circumstances surrounding the debtor's finances, including an ability to pay creditors, whether the debtor's budget is excessive, whether the debtor has reaffirmed a large amount of secured debt, whether there was an incurrence of cash advances or excessive consumer purchases in contemplation of filing, and whether the debtor has a stable income;
>
> 2. the debtor's truthfulness, including whether the schedules accurately reflected the debtor's true financial condition and whether the debtor filed in good faith; and
>
> 3. other factors related to the reason or need for filing, such as whether the petition was filed due to unforeseen circumstances including illness, calamity, disability, or unemployment, and whether the debtor could have negotiated with creditors outside of bankruptcy.
>
> *Daugherty*, 2009 Bankr. Lexis at *12-3.

In the case at bar, the court's overall view is that abuse exists. The drastic

consequences of chapter 7 for Debtor's creditors are not justified by the circumstances

surrounding Debtor's filing, and Debtor's style of life is too opulent to allow Debtor the

easier route to freedom from debt afforded by a no-asset liquidation. Analysis of the

factors reviewed in *Daugherty* supports this conclusion.

**1. Financial Factors**

The first category of factors to be considered under *Daugherty*  relates to the

Debtor's financial circumstances. In the instant case these factors clearly weigh against

Debtor.

Debtor's budget is excessive. His house payment, including taxes and insurance,

is $4,072.72 per month. Additionally, Debtor pays $186 per month in home owners'

---

[9]     *Daugherty* categorized a number of factors suggested by other courts for use in determining abuse. *Id*. at *12-3.

association ("HOA") dues (UST's Exhibit 4; hereafter the UST's exhibits will be reflected as TX and a number, and Debtor's exhibits will be reflected as DX and a number). The IRS guidelines for a family of three in Tarrant County allow for monthly housing expenses of $1,531.[10] *See* TX21. Debtor's housing expenses, not including any utilities, which are included in the IRS Guidelines, are $4,258 (this amount includes Debtor's mortgage, taxes, HOA dues, and insurance), almost three times the amount reflected on the IRS Guidelines as appropriate. *See* TX25 and TX26. Debtor's housing expenses, including all IRS guideline items, total just short of three and a half times the amount set by the IRS Guidelines.

In addition to having housing expenses that far exceed the IRS Guidelines, Debtor reaffirmed $114,542.24 of secured debt. *See* TX6, TX7, and TX8. This includes Debtor's $59,605.96 second mortgage, $19,129.43 owed on Debtor's Acura, and $35,806.85 owed on Debtor's Lexus. If Debtor had purchased or leased less expensive cars there could be a return to creditors under a chapter 13 plan.[11]

The parties agreed in the Stipulation that Debtor's net income (including that of the non-debtor spouse) is $7,796.50 per month. This is approximately $1,100 per month less than was reflected on Debtor's schedule I and is partially due to elimination of Debtor's bonus for 2010 and a 5% reduction in his salary. While it has been stipulated that Debtor's net income has decreased since his bankruptcy filing, there has been no

---

[10]    The IRS guidelines for housing include "mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone and cell phone." Adding (from Debtor's schedule J or Debtor's testimony) the above listed items raises Debtor's total housing cost to $5,351.95.

[11]    As already noted, at the Hearing Debtor testified that the Acura and Lexus, purchased less than six months before his filing, replaced more expensive vehicles. That may be, but both the Acura and the Lexus are luxury vehicles, and much less costly but equally serviceable cars could have been chosen – and should have been, given Debtor's financial situation in late 2008.

evidence that either Debtor's job, or that of his wife, is in danger. In fact, according to the

Stipulation, Debtor's wife has received a pay increase since the commencement of his

bankruptcy. Additionally, at the Hearing Debtor testified that the elimination of his bonus

was a result of the currently weak economy and that it is possible that it would be

reinstated for 2011.[12]

In sum the financial factors of the *Daugherty* test weigh in favor of dismissal of

Debtor's case because it is inequitable for Debtor to maintain a relatively lavish lifestyle

including keeping a house valued at over $500,000 and two luxury cars, while almost

$150,000 in unsecured debt will be left unpaid. As discussed below, in a case such as

this, in exchange for a discharge, creditors should retain the possibility of some return

should Debtor's circumstances change such that his disposable income would allow such

payment.

**2. Truthfulness Factors**

The second category of factors to be considered under the *Daugherty* test looks at

how truthful Debtor was in his bankruptcy schedules and whether he acted in good faith.

As was stated above, the court need not examine whether Debtor acted in good faith.[13]

However, the court does question whether Debtor's schedules fully and accurately

reflected his financial situation at the time of bankruptcy.

---

[12]     The court takes into account possible reinstatement of Debtor's bonus because if the Motion is granted, as discussed below Debtor would have the option of converting his case to a chapter 13 case. In chapter 13, a future improvement in Debtor's income could bring benefit to his unsecured creditors through a plan modification. *See* Code § 1329.

[13]     Though "good faith" as used by the courts in evaluating the totality of the circumstances under Code § 707(b)(3)(A)(i)(B) is not necessarily the same as the term as used in section 707(b)(3)(A)(i)(A), the court is not prepared to find bad faith under the former provision for the same reasons.

In the Motion the UST asserts that Debtor failed to disclose all of his sources of income for 2008. The UST points out that on sheet 1 of Debtor's Statement of Financial Affairs (TX2) he reported that he earned $107,038 in 2008 and that he lists $148,593 in gross earnings on his 2008 income tax return. TX16. Yet, Debtor's bank accounts show that he deposited $446,157 in 2008. Debtor has stipulated that he sold the future payments of his annuity in 2008 for $150,000.[14] The most Debtor could have deposited into his account during 2008 from known sources is $339,961,[15] leaving a discrepancy of $106,196. The UST acknowledges, however, that part of the discrepancy between Debtor's deposits and his scheduled income is probably attributable to expense reimbursements.

The court, balancing the evidence, cannot find that Debtor received $106,196 in expense reimbursements in 2008. In examining Debtor's explanation for deposits during the year 2008 (TX14) the court notes that Debtor made multiple deposits which are labeled as "Bookie pay" and several other deposits that are labeled as "PAYPAL" and "money gram". Based on the evidence, the court finds that at least some of these deposits are winnings Debtor received from gambling. Debtor should have reflected these winnings as income on his Statement of Financial Affairs.

The UST also pointed out that Debtor made a $1,838.63 post-petition payment to his bookie on an undisclosed pre-petition gambling debt. Under the Code, all pre-petition

---

[14]    Debtor's Statement of Financial Affairs reflects this sale as being for $140,000, at variance with his testimony at the Hearing.

[15]    This amount includes Debtor's $148,593 salary, $150,000 from the sale of Debtor's annuity, and Debtor's wife's $41,368.32 salary. Though Debtor did not list his non-debtor wife's salary on his Statement of Financial affairs, it may have been deposited in Debtor's bank accounts. Debtor scheduled his wife's gross income as $3,447.36 per month, or $41,368.32 per year. This computation makes no allowance for withholding of taxes by Debtor's or his wife's employer.

debts must be scheduled. Although Debtor testified that he simply did not realize he still owed his bookie money, the court is not persuaded.

Section 3 of the Statement of Financial Affairs requires debtors to disclose "all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately proceeding the commencement" of a bankruptcy case. Debtor did not list any payments to his bookie on his Statement of Financial Affairs. Given that Debtor testified his gambling stopped in May of 2009, the court finds that Debtor made bets in the 90 days prior to his chapter 7 filing. Further, through the Stipulation Debtor admitted that he incurred approximately $5,000 in gambling losses in 2009. Considering that Debtor took the risk of paying his bookie post-petition, the court concludes that Debtor also paid his bookie for pre-petition debts accrued within the relevant period.[16]

Finally, Debtor's reaffirmation agreements for his second mortgage and his Acura both show that his actual monthly expenses are $5,700. This is roughly half of what Debtor reported on his schedule J.

The court concludes that the truthfulness factors weigh against Debtor. Debtor failed to reflect all of his income on his schedule I, failed to schedule a pre-petition debt which he subsequently paid post-petition (in preference to other creditors), failed to list all creditor payments as required by the Statement of Financial Affairs, and reported materially different monthly expenses on his reaffirmation agreements than what he reflected on his bankruptcy schedules.

---

[16] At the Hearing Debtor testified that most of his gambling was paid through credit cards. None of Debtor's credit card statements are in the record, so the court can not ascertain the amount of gambling payments Debtor should have listed on his Statement of Financial Affairs.

### 3. Other Factors

The final *Daugherty* test examines any factors other than financial and truthfulness factors surrounding the bankruptcy filing. These factors might include the reason for filing and whether the debtor made any attempts to avoid bankruptcy. In the instant case, the court concludes that these factors are neutral.

At the Hearing Debtor testified that his bankruptcy resulted from the large debts that he incurred through gambling. Debtor also presented evidence, through the testimony of Vorkoper, the he could not control his gambling. Debtor relies on Vorkoper's diagnosis that Debtor is addicted to gambling, and is therefore a compulsive gambler. Debtor argues that because he is a compulsive gambler, an addiction recognized in the *Diagnostic and Statistical Manual of Mental Disorders-V*, his gambling is a disease which, like other physical diseases, excuses his incurrence of debts he cannot pay.

The court is not unsympathetic to Debtor. It is true that there are some similarities between compulsive gambling and other diseases. However, there is a difference between a gambling addiction and other diseases, for example cancer. Gambling, whether compulsive or otherwise, involves an element of choice.[17] The same is not true of physical diseases.[18] A debtor who accumulates massive hospital debts as a result of cancer never made a choice to get cancer; a debtor who accumulates massive debts as a result of gambling made a choice to gamble every time he or she stepped up to the table or placed a bet with a bookie.

---

[17] That Debtor had a choice is evidenced by his (apparently effective) post-petition decision to quit gambling as well as his election to obtain treatment.

[18] Some physical diseases – *e.g,*. lung cancer – may be induced by bad choices. However, the choice in such cases does not equate to the disease itself. Moreover, Debtor's gambling was not legal; he chose to violate the law; a smoker does not violate the law by his bad choice.

At the Hearing both Debtor and Vorkoper testified that Debtor sought treatment for his addiction. The court acknowledges Debtor's eventual recognition of his problem and his choice to seek treatment for his gambling addiction. The court would encourage Debtor to continue his treatment regardless of whether his debts are ever discharged. The court cannot, however, place a "disease" that was elected by its victim and that results in illegal conduct with the sort of catastrophes that in the context of section 707(b)(1) have favored a finding of no abuse. If the court cannot penalize Debtor for his gambling, neither can it find that addiction reason to excuse him from his monetary obligations through the easy route offered by chapter 7. This factor is therefore neither favorable nor unfavorable to Debtor.[19]

**B. Chapter 13**

In his brief in response to the court's questions (*see* n. 1, above) Debtor argues that the court should consider the fact that even if Debtor had filed under chapter 13, Debtor's chapter 13 plan would provide for no return to unsecured creditors. The court understands this is true at the present time, but a chapter 13 case lasts for five years[20] and it is possible that within that time frame Debtor's financial circumstances will improve whether through reinstatement of his pay and bonus or otherwise. Should his circumstances improve sufficiently, though his original plan may provide nothing for

---

[19] The court notes that Debtor did, through sale of his annuity, seek to solve his problems other than through bankruptcy. Had Debtor then stopped gambling and sought treatment rather than waiting until after he had incurred further substantial debt to support his habit (and waiting until after filing his chapter 7 petition to give up gambling and seek treatment), that would weigh significantly in Debtor's favor.

[20] *See* Code § 1325(b)(4). As Debtor is "above median," section 1325(b)(4)(A)(ii) requires a five year "commitment period" for Debtor's plan.

unsecured creditors, a modification could be proposed by Debtor, the chapter 13 trustee, or an unsecured creditor to provide a return against unsecured claims. Code § 1329(a).

Some of Debtor's financial hardship is due to a reduction in Debtor's pay and elimination of his bonus. Debtor testified at the Hearing that these reductions are the result of current economic instability and that if the economy improves Debtor's pay and bonus may be reinstated. *See* DX5.

The UST, however, urged in his post-Hearing brief that Debtor not even be given the alternative of relief through chapter 13. The UST argues Debtor is guilty of such bad faith he should be denied the benefit of any assistance from the Code.

The court disagrees. First, Congress intended the provisions of section 707(b), both pre- and post-BAPCPA, to encourage individuals to proceed under chapter 13. *See in re* Goddard, 323 B.R. 231, 233-34 (Bankr. S.D. Ohio 2005); 151 Cong. Rec. S1856 (Mar. 1, 2005 (statement of Sen. Charles Grassley))[21] Second, Debtor does not stand alone; he has a wife and children. His inability to deal with his debt will penalize them as well as him. The court concludes that while Congress may have meant to encourage use of chapter 13, it is unlikely that the legislator intended, by section 707(b), to deny any relief if relief is necessary to preserve and protect a family. Finally, if Debtor's conduct is such that he should be denied the benefit of chapter 13, that is a decision to be reached in the context of chapter 13 – not speculatively in the present context. Were Debtor, for

---

[21]    In discussing section 707(b) Senator Grassley said:

"It is this simple: If repayment is possible, then he or she will be channeled into chapter 13 of the Bankruptcy Code which requires people to repay a portion of their debt as a precondition for limited debt cancellation. In other words, people who have the ability to pay will not get off scot-free anymore."

"This bill [BAPCPA] does this by providing for a means-tested way of steering people who are filers, who can repay a portion of their debts, away from chapter 7 bankruptcy."

example, to propose a plan to pay his creditors in full, it is unlikely anyone would argue

he should be refused the chance to perform that plan.

For all these reasons, the court concludes that, while the totality of Debtor's

circumstances supports a finding that his filing of chapter 7 constitutes an abuse of that

chapter, he should have the ability to deal with the claims against him under chapter 13.

### III. Conclusion

Two of the three *Daugherty* test factors weigh against Debtor. The court will,

therefore, grant the Motion under Code § 707(b)(3)(B) because the totality of the

circumstances demonstrates abuse of chapter 7. Debtor, however, may elect to proceed

under chapter 13. Debtor's chapter 7 case will be dismissed if, within 20 days of entry of

this memorandum opinion, Debtor does not convert his case to chapter 13. If Debtor

chooses not to convert his case, the UST will submit an order granting the Motion 20

days after entry of this memorandum opinion.

#### END OF MEMORANDUM OPINION ####